**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| ARLENE RODRIGUEZ GARZA | Case No.: |
| Plaintiffs, | **Jury Trial Demanded** |
| v. | |
| WELLSPAN PHILHAVEN | |
| Defendants. | |

## COMPLAINT

Plaintiff Arlene Rodriguez Garza ("Plaintiff") brings this complaint against Wellspan Philhaven ("Defendant") and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for disability, religious, and pregnancy-based discrimination, hostile work environment and retaliation in violation of the Americans with Disabilities Act ("ADA"); Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.,* and the Pregnancy Discrimination Act of 1978 ("PDA"). Moreover, this Honorable Court has jurisdiction over Plaintiff's state law claims to the extent that he pleads them pursuant to 28 U.S.C. §1367.

## THE PARTIES

2. The Plaintiff is a citizen of the Commonwealth of Pennsylvania.

3. Defendant is a business organized under the laws of Pennsylvania with its principal place of business at 1101 Edgar Street, York, PA 17403.

## JURISDICTION AND VENUE

4. This Court has original jurisdiction of this action pursuant to 28 U.S.C. §1331 as one arising under laws of the United States. *See* 28 U.S.C. §1331.

5. Venue is proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the "unlawful employment practice[s]" giving rise to this lawsuit took place within this district.

## FACTUAL BACKGROUND

6. Plaintiff is a 33-year-old female who worked as a Medical Assistant for the Defendant from June 2015 until date of termination on March 7, 2022, at a rate of $19.32 an hour, full time, plus benefits.

7. On September 30, 2021, Plaintiff received her annual review report from supervisor, Mandy Jones. Plaintiff scored either above Meets Expectations or Exceeds Expectations on every Graded Category. (See **Exhibit A**) It was around this same time that many employees were talking about the possibility of Wellspan enforcing the Covid-19 vaccine. Plaintiff's lead, Mercy Zapata, discouraged Plaintiff from filing a religious exemption. Ms. Zapata mentioned she had done some research and found that the Christian religious exemptions were not being granted.

8. On October 20, 2021, Plaintiff tested positive for Covid-19 and was out on medical leave for three (3) weeks.

9. On October 21, 2021, Defendant notified all employees that they must be fully vaccinated by December 6, 2021, or file for either a Religious or Medical Exemption. (See **Exhibit B**)

10. On November 10, 2021, Plaintiff returned to work. Later in the week, Ms. Jones asked the Plaintiff what she was going to do about getting the Covid-19 vaccine. The Plaintiff was still experiencing lingering Covid-19 symptoms like muscle twitching and weakness which she relayed to Ms. Jones. The Plaintiff then told Ms. Jones that she did not feel comfortable getting the vaccine this soon after she just had Covid-19. Plaintiff told Ms. Jones that she would have to seek an exemption.

11. On November 30, 2021, Plaintiff had an appointment with her Primary Care Physician ("PCP") who is affiliated with the Wellspan Health Network. Plaintiff requested a medical exemption because she was still experiencing lingering muscle twitching and weakness and had anxiety with getting the Covid-19 vaccine. Plaintiff's PCP denied her exemption.

12. On December 2, 2021, Defendant informed all employees the flu and Covid-19 vaccine mandate for December 6, 2021, would be paused until further notice. Within that notice, the Defendant states the following: "With a relatively low number of employees not yet vaccinated, we will work closely with them to ensure they continue their pursuit of either an exemption, or

vaccination as part of the programs.  It is our desire to retain all our valued team members as part of WellSpan Health." (See **Exhibit C**)

13. On December 7, 2021, the Plaintiff filed for a religious exemption. (See **Exhibit D**)

14. On or about December 8, 2021, the Plaintiff took a home pregnancy test to discover that she was pregnant.

15. On December 9, 2021, Defendant informed all employees that Vaccine exemptions will no longer be available. Within that same newsletter, Defendant was requesting employees to refer potential candidates to work, and they can receive a $10,000 bonus. (See **Exhibit E**)

16. On December 10, 2021, Plaintiff's blood test confirmed her pregnancy.  Later that afternoon, Plaintiff informed Ms. Jones of her high-risk pregnancy and that she wished to file for a medical exemption.  Ms. Jones told Plaintiff that she could provide her with information about pregnancy and getting the Covid-19 vaccine.

17. In the beginning of January 2022, Defendant announced that all employees must be fully vaccinated by February 28, 2022, to avoid suspension without pay and would subsequently be terminated on March 7, 2022.  Every two (2) weeks, unvaccinated individuals received reminders via email.

18. On February 23, 2022, Ms. Jones advised Plaintiff to complete a resignation letter prior to her suspension date.

19. On February 24, 2022, Ms. Jones sent an email to Plaintiff asking for her to give a resignation date. Plaintiff responded that she would not voluntarily resign as it was not her decision to leave. (See **Exhibit F** -including a typed version after the original page)

20. Plaintiff was terminated on March 7, 2022.

21. Upon information and belief, Defendant' own records will likely demonstrate that Defendant knew the vaccines mandated by Defendant were not effective at stopping transmission of the virus during the relevant timeframes.

22. Any reasonable person viewing these facts would deduce Defendant simply intended to undermine Plaintiff's religious beliefs and medical accommodation and that Defendant's reasons for not providing accommodations was pretextual.

23. The EEOC Guidelines have made clear that "when there is more than one means of accommodation which would not cause undue hardship"—which existed in Plaintiff's case— "the employer . . . must offer the alternative which least disadvantages the individual with respect to his or her employment opportunities." *See EEOC Commission Guidelines*, 29 C.F.R. § 1605.2(c)(2)(ii).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

24. All conditions precedent to filing claims under the ADA, Title VII and the PDA have been performed or have occurred. Namely, Plaintiff filed a timely charge of discrimination with the U.S. Equal Employment Opportunity Commissions ("EEOC") as dual filed with the Pennsylvania Human Relations Commission ("PHRC") on August 17, 2022. The Plaintiff has fully exhausted her administrative remedies as to her federal claims and is entitled to file in district court (see **Exhibit G**). The Plaintiff will seasonably amend her pleadings to include her claims falling under the Pennsylvania Human Relations Act ("PHRA") once they have been fully exhausted at the Pennsylvania Human Relations Commission.

## REASONABLE ACCOMODATION OPTIONS UNJUSTIFIABLY REJECTED BY DEFENDANT

25. Defendant could have accommodated the Plaintiff's sincerely held religious beliefs and high-risk pregnancy without undue hardship (indeed, with no cost whatsoever, if Plaintiff paid for testing, for example). Defendant failed to engage in the interactive process to legitimately consider all possible accommodations. This caused Defendant to overlook accommodations posing less than a *de minimis* burden including: (1) testing for COVID antibodies and acknowledging that Plaintiff's natural immunity satisfied the Defendant's immunization requirements (because it is superior to vaccine-induced

immunity); (2) weekly testing for COVID-19 (for which Defendant had been conducting and which is a more reliable indication of safety than vaccination); (3) masking; or (4) any combination of the above.

26. At the time of Plaintiff's termination, the CDC had conclusively stated that individuals vaccinated for COVID-19 could nevertheless contract and spread COVID-19. On March 29, 2021, the Director of the CDC Rochelle Walensky publicly stated that the CDC's own data "suggests, you know, that vaccinated people do not carry the virus, don't get sick, and that it's not just in the clinical trials but it's also in real world data."[1]

27. However, because the real-world data already demonstrated breakthrough infections in the vaccinated just three months after the Pfizer-BioNTech vaccine received FDA approval, the CDC immediately thereafter clarified Director Walensky's statements and confirmed that vaccinated individuals do in fact become infected and spread the virus to others. *See* CDC Reverses Statement by Director, (April 2, 2021), available at: https://thehill.com/changingamerica/well-being/546234-cdc-reverses-statement-by-director-that-vaccinated-people-are-no/.

---

[1] Statement from CDC Director Rochelle P. Walensky, MD, MPH on Rachel Maddow Show (March 29, 2021), transcript available at: https://www.msnbc.com/transcripts/transcript-rachel-maddow-show-3-29-21-n1262442?utm_content=buffer7fb12&utm_medium=Arianna&utm_source=LinkedIn&utm_campaign=Buffer.

28. Before instituting its vaccination policy, Defendant knew or should have known that the vaccines were largely ineffective at controlling the spread of COVID-19. As early as July 2021, Director Walensky admitted that the vaccinated had similarly high viral loads of SARS-CoV-2 as the unvaccinated and thus could still contract and spread the Delta variant.[2]

29. In August 2021, a joint study by CDC and the Wisconsin Department of Health services further confirmed Director Walensky's admission. The study indicated that vaccinated individuals had a 5% higher viral load than the unvaccinated and were not only just as likely to transmit the virus as the unvaccinated but posed a greater contagion risk due to the increased likelihood of asymptomatic infection.[3]

30. Highlighting the irrationality of Defendant's continued pursuit of enforcing its mandate against religious, disabled, and pregnant employees, Defendant also refused to recognize natural immunity as satisfying its immunization

---

[2] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, CDC News Room (July 30, 2021), available at https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html [https://perma.cc/VR5V-E67A] ("Today, some of those data were published in CDC's Morbidity and Mortality Weekly Report (MMWR), demonstrating that Delta infection resulted in similarly high SARSCoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus.").

[3] *See* Kasen Riemersma, et. al, *Shedding of Infectious SARS-CoV-2 Despite Vaccination, medRxiv* (August 24, 2021), available at:
https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v4.full.pdf.

requirement. This is despite the fact that the international scientific community had conclusively established through centuries of research that natural immunity is superior to vaccine-elicited immunity. *See Plotkin's Vaccines*, 7th Edition, at Section 2.

31. Defendant is a sophisticated healthcare company which focuses on sophisticated medical services and should have been aware of the fallacy of enforcing its vaccination Policy in the context of undue hardship and failed to even consider the religious beliefs, or medical and pregnancy needs of Plaintiff when determining whether it could exempt her.

32. Recognizing Plaintiff's natural immunity to COVID-19 as an alternative to vaccination would have required no cost or action of the Defendant and would have imposed no logistical or administrative burden on the Defendant. It would have simply required that the Defendant acknowledge scientific reality.

33. Alternatively, continued periodic COVID-19 testing and masking (which, again, was already accommodated and for which medical personnel had undertaken throughout the Pandemic and before vaccines were available) would have been a costless accommodation.

34. As the CDC recognized in August of 2021, COVID-19 vaccines work "with regard to severe illness and death—they prevent it. But what they can't do anymore is prevent transmission."[4]

35. Because vaccinated individuals may also contract and transmit COVID-19, a negative COVID-19 test is a more reliable indication of safety from the virus than a vaccination at some earlier time. This fact was also well-known at the time Defendant chose not to exempt Plaintiff and should have been considered as a reasonable accommodation to the vaccine mandate.

36. Having Plaintiff wear, a mask on the occasions she was involved with patients was another possible reasonable accommodation. As Defendant' peers in the industry have shown—including vaccine manufacturer Janssen (J&J)—religious, pregnant, and disabled employees may be accommodated without increased risk or cost through testing and masking.

## **APPLICABLE LAW UNDER TITLE VII**

37. Title VII prohibits Defendant from discriminating against employees based on their religion. 42 U.S.C. § 2000e-2(a)(1). This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . .

---

[4] Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021),
available at https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

religious observance or practice without undue hardship on the conduct of the

employer's business." 42 U.S.C. § 2000e(j).

38. In other words, an employer must "make reasonable accommodation for the

religious observances of its employees, short of incurring an undue hardship."

*EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008)

(quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

39. This allows a plaintiff to raise claims of religious discrimination under both

a disparate treatment theory and a failure-to-accommodate theory. *Chalmers*

*v. Tulon Co. of Richmond*, 101 F.3d 1012, 1018 (4th Cir. 1996).

40. Failure to engage in the interactive process to find a solution for an exempt

employee "is not an independent violation of Title VII. But as a practical

matter, such failure can have adverse legal consequences [because] where an

employer has made no effort to act on an accommodation request, courts have

found that the employer lacked the evidence needed to meet its burden of

proof to establish that the plaintiff's proposed accommodation (or proposed

continued accommodation) would actually have posed an undue hardship."

EEOC Guidance, *Section 12: Religious Discrimination*, Part 12-IV.A.2

(citing *EEOC v. Ithaca Indus., Inc*., 849 F.2d 116, 118-19 (4th Cir. 1988)

(finding that employer's failure to attempt to accommodate, absent any

showing of undue hardship, violated Title VII)); *see also EEOC v. Arlington*

*Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991) ("After failing to pursue . . . any other reasonable accommodation, the company is in no position to argue that it was unable to accommodate (or continue accommodating) reasonably [plaintiff's] religious needs without undue hardship on the conduct on its business.").

41. Title VII also prohibits Defendant from retaliating against an employee for engaging in protected activity. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 571 (3d Cir. 2002) *see also*, *Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d Cir. 2006) *Ferra v. Potter*, 324 F. App'x 189, 192 (3d Cir. 2009) ("As this Court has explained, '[w]ith respect to `protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings . . . and those who oppose discrimination made un-lawful by Title VII. . . .'").

42. Additionally, placing Plaintiff on a "temporary hiatus" as to the need to be vaccinated and then telling her she would be terminated later once the hiatus was lifted, and then terminating her, is a violation of applicable law.

## FIRST CLAIM FOR RELIEF
## ADA DISABILITY DISCRIMINATION

43.    Plaintiff incorporates herein the previous averments as if fully set forth.

44.    Plaintiff is a qualified individual with a disability under the PHRA due to her high-risk pregnancy and anxiety and defendants' notice of the same.

45.     The Plaintiff had a record of disability and/or was regarded as disabled by the Defendants.

46.     The ADA prohibits discrimination in the workplace against employees who have, *inter alia*, sought assistance for accommodation in the workplace.

47.     Plaintiff requested accommodation pursuant to state and federal law, i.e., exemption from vaccine.

48.     Defendant failed to accommodate Plaintiff's disability and instead, it fired her when she sought leave for medical reasons related to her disability.

**WHEREFORE**, Plaintiff prays that this Honorable Court will order all appropriate relief pursuant to ADA and any other applicable statutory remedies including but not limited to monetary relief for the Plaintiff, including as applicable compensatory damages including wage loss, pain and suffering and punitive relief as well as all reasonable attorney's fees and costs of litigation.

## SECOND CLAIM FOR RELIEF
## ADA DISABILITY-HOSTILE WORK ENVIRONMENT

49.     Plaintiff incorporates herein the previous averments as if fully set forth.

50.     The Plaintiff avers that she is a qualified individual with a disability under the ADA due to her high-risk pregnancy and anxiety and Defendant's notice of the same. Additionally, the Plaintiff has been under a physician's care for her disabilities since she was diagnosed.

51.     The Plaintiff was subject to unwelcome harassment after she sought disability accommodations.

52.     Further, the harassment was sufficiently severe or pervasive as to alter the conditions of Plaintiff's employment and to create an abusive and hostile working environment because the Plaintiff was harassed due to her medical and mental health conditions when her supervisor, human resources and corporate relations bullied and intimidated her when she sought accommodations.

53.     Defendant knew, or reasonably should have known of the harassment, and failed to take prompt, effective remedial action, instead taking adverse action against the Plaintiff by firing her.

54.     The fact that the Plaintiff's supervisors were perpetrators of the harassment entitles the Plaintiff to strict liability for her claims.

**WHEREFORE**, Plaintiff prays that this Honorable Court will order all appropriate relief pursuant to ADA and any other applicable statutory remedies including but not limited to monetary relief for the Plaintiff, including as applicable compensatory damages including wage loss, pain and suffering and punitive relief as well as all reasonable attorney's fees and costs of litigation.

## <u>THIRD CLAIM FOR RELIEF</u>
### ADA DISABILITY RETALIATION

55.    Plaintiff incorporates herein the previous averments as if fully set forth.

56.    The ADA prohibits retaliation in the workplace against employees who have, *inter alia*, sought assistance for accommodation in the workplace or have otherwise opposed practices made unlawful under the law.

57.    The Plaintiff's requests for accommodation in the workplace constituted "protected activity" pursuant to state and federal law.

58.    Defendant retaliated against the Plaintiff on account of her protected activity when it fired her after she sought medical leave accommodations related to her disability and after she ongoing harassment.

59.    Furthermore, Plaintiff avers that the Defendant's purported basis to harass and terminate her (e.g., not qualified for an exemption) is false and erroneous and a pretext for underlying invidious reasons.

60.    As a result, the Plaintiff avers that the Defendants retaliated against her on account of her protected activity by imposing discipline and discharging her without justification.

**WHEREFORE**, Plaintiff prays that this Honorable Court will order all appropriate relief pursuant to ADA and any other applicable statutory remedies including but not limited to monetary relief for the Plaintiff, including as applicable

compensatory damages including wage loss, pain and suffering and punitive relief as well as all reasonable attorney's fees and costs of litigation.

**FOURTH CLAIM FOR RELIEF**
**TITLE VII – RELIGIOUS DISCRIMINATION –**
**FAILURE TO ACCOMMODATE**
(42U.S.C. § 2000e-2(a)(1))

61. Plaintiff incorporates herein the previous averments as if fully set forth.

62. An employee may assert a claim, for his employer's failure to accommodate, or continue accommodating an existing accommodation, of his sincere religious beliefs, so long as the accommodation does not impose undue hardship on the employer. *See Storey v. Burns Intern. Sec. Servs.,* 390 F.3d 760, 764 (3d Cir. 2004) ("An employer's failure to reasonably accommodate an employee's sincerely held religious belief that conflicts with a job requirement can also amount to an adverse employment action unless the employer can demonstrate that such an accommodation would result in 'undue hardship.'").

63. To establish a prima facie claim for failure to accommodate a plaintiff must present evidence that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Wilkerson v. New Media,* 522 F.3d 315, 319 (3d Cir. 2008) ("To establish a prima facie case of a failure to

accommodate claim, the employee must show: (1) she has a sincere religious belief that conflicts with a job requirement; (2) she told the employer about the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement.") (*Quoting Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

64. Once the plaintiff has made out a prima facie case for discrimination, "the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship." *Groff v. Dejoy,* 35 F.4th 162, 169 (3d Cir. 2022).

65. Plaintiff clearly established her "bona fide religious belief" and its conflict with the Policy when she submitted her religious accommodation request to Defendant. Because Plaintiff could not receive the COVID-19 vaccine without violating her religious beliefs, she could not comply with the Policy and was thus subject to adverse action through both "temporary hiatus" and termination. While Defendant may now attempt to challenge Plaintiff's beliefs, it is not the employer's place to question or interpret an employees religious beliefs, *Equal Employment Opportunity Commission v. Geo Group, Inc.,* 616 F.3d 265, 291 (3d Cir. 2010) ("An employer is not entitled to interpret the employee's religion and determine what is and is not religiously acceptable to them.").

66. Defendant provided a reasonable accommodation option but one which was only temporary and furthermore chose to chill the employee's faith-based requests by telling her she would be terminated based on a deadline if she was not in compliance. Thereafter, it terminated Plaintiff without engaging further in any interactive process to attempt to find workable continuing accommodation that would not pose an undue hardship to the company. Even if not a standalone claim, the failure to engage in a meaningful interactive process signals an employer's violation of its duty to accommodate because the employer is attempting to remain purposefully ignorant of potential reasonable accommodations.

67. To establish the defense of "undue hardship," Defendant must demonstrate that any of the aforesaid accommodations would "bear more than a *de minimis* cost" on the company. *Hardison*, 432 U.S. at 84. The above stated accommodations required no additional cost or logistical burden to Defendant, as was seen when the company brought back and accommodated numerous employees from around the country who also held sincere religious beliefs that prevented them from taking the vaccine. Defendant also provided accommodation, albeit via a "temporary hiatus". How then was it an undue hardship to continue accommodating what it had already accommodated.

68. The ability to provide reasonable accommodations to employees such as Plaintiff is also evident by considering other companies similarly situated to Defendant—including countless hospitals and even COVID-19 vaccine manufacturers such as Janssen (J&J)—that were able to accommodate employees with religious based objections to mandatory COVID-19 vaccination policies. Defendant is thus without excuse as to why it failed also to follow federal employment law in this regard.

69. Title VII requires an employer to thoroughly consider all possible reasonable accommodations and not just reject requests out of hand with form denials. "If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective."[5]

70. Such accommodation might include things such as masking and testing. In the face of the reasonable options proposed here, Defendant cannot demonstrate even a *de minimis* burden in providing Plaintiff with accommodation.

71. To be sure, testing was a reasonable accommodation even for people physically entering the workplace—it is undisputed that someone cannot catch COVID-19 from someone who does not have COVID-19. And to the

---

[5] EEOC Guidance Section 12: Religious Discrimination; Part IV, A.2.

extent that Plaintiff would even need to be in contact with other employees or patients, a negative COVID-19 test would have confirmed that she was less of a contagion hazard than untested individuals who were vaccinated at some earlier point in time but who could still contract and transmit COVID-19.

72. In denying Plaintiff's request, Defendant blankly asserted "significant undue hardship" and provided no justification as to why or how the several options she proposed (and were clearly available as it had so accommodated her) were unable to be done without undue hardship. This is especially true where recognition of Plaintiff's natural immunity (for example) required no cost, effort, or operational change to the status quo.

73. Moreover, Defendant was on actual of notice both, the many possible accommodation options for Plaintiff (as it had provided some from prior use of masks and testing) and the fact that the failure to continue using one or more of them would result in a Title VII violation. Nonetheless, Defendant forged forward with its campaign to eliminate its religious employees, including Plaintiff.

74. Therefore, Defendant unlawfully discriminated against Plaintiff based on her sincerely religious beliefs by failing to accommodate or continue accommodating those beliefs. Defendant cannot demonstrate that doing so would have imposed any hardship whatsoever, let alone undue hardship.

## <u>FIFTH CLAIM FOR RELIEF</u>
## TITLE VII – RELIGIOUS DISCRIMINATION – DISPARATE TREATMENT
### (42U.S.C. § 2000e-2(a)(1))

75. Plaintiff incorporates herein the previous averments as if fully set forth.

76. Title VII also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made unlawful by this subchapter." 42 U.S.C. § 2000e-3(a). 116. A prima facie case for retaliation requires a showing "that (1) she engaged in activity protected by Title VII; (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and the adverse action." *Ortiz v. Delta Dental of Pa.,* Civil No. 1:18-CV-456, at *11 (M.D. Pa. May 13, 2020).

77. Here, Plaintiff engaged in protected activity under Title VII when she sought a religious accommodation from the Policy that would otherwise require her to violate her sincere religious beliefs and opposed being forced to take a vaccine that was against her beliefs.

78. Then, because of her request for accommodation, Defendant subjected Plaintiff to its sham process in violation of federal law.

79. Defendant never intended to accommodate Plaintiff. As a result, she was forced from her employment.

80. Were it not for Plaintiff's religious beliefs and her request for accommodation, she would not have been subjected to such treatment.

81. Plaintiff was then placed on a "temporary hiatus" with the caveat that she would later be terminated —a further coercive technique—only to terminate her at the end of the set period of temporary accommodation.

82. Upon information and belief, Defendant imposed the period of temporary accommodation with the intent to punish those who sought religious accommodations.

83. Further, Plaintiff was exposed to physicians that were told by the Defendant that they could not write a script or letter providing support for accommodation.

84. Defendant hoped that the constant reminder of termination would result in Plaintiff abandoning her religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

85. Defendant' Policy forced those who were denied religious accommodations into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

86. But for her request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from the period of unpaid leave where she was constantly pressured to violate her beliefs.

87. Defendant also terminated Plaintiff for seeking a continued religious accommodation to its compulsory vaccination policy. Plaintiff maintained her request for accommodation through the date of her termination.

88. Separately, Defendant refused to admit its mistake and bring Plaintiff back even after it became apparent that (1) accommodations were available; (2) the COVID-19 vaccines were not preventing contraction of the virus; and (3) individuals with natural immunity possessed superior immunity to those with the vaccine only. Such actions were due to Plaintiff's opposition to Defendant' illegal employment practice. The company had made up its mind to purge as many unvaccinated religious employees as it believed it could and the position against those seeking accommodations had become entrenched.

89. Defendant' actions forced those denied accommodation onto temporary accommodation just to terminate them after an arbitrary specified period, and then not bringing them back when it was possible constitutes retaliation in violation of Title VII.

## SIXTH CLAIM FOR RELIEF
### TITLE VII – RETALIATION – OPPOSITION CLAUSE
(42 U.S.C. §2000e-3(a))

90. Plaintiff incorporates herein the previous averments as if fully set forth.

91. Title VII also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made unlawful by this subchapter." 42 U.S.C. § 2000e-3(a).

92. A *prima facie* case for retaliation requires a showing "that (1) he engaged in activity protected by Title VII; (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and the adverse action." *Ortiz,* Civil No. 1:18-CV-456, at *11.

93. Here, Plaintiff engaged in protected activity under Title VII when she sought a religious accommodation from the Policy that would otherwise require her to violate her sincere religious beliefs. Plaintiff continued to oppose Defendant's unlawful practice through her formal termination.

94. Further, Plaintiff was exposed to physicians that were told by the Defendant that they could not write a script or letter providing support for accommodation.

95. Then, because of her request for accommodation, Defendant subjected Plaintiff to its process to coerce her from exercising her rights under federal law. Defendant's Policy was not designed to look for reasonable accommodation for Plaintiff because Defendant never intended to fully accommodate Plaintiff. Were it not for Plaintiff's beliefs and her request for accommodation, she would not have been subjected to such treatment.

96. After denying Plaintiff's request, AND Plaintiff's opposition thereto, and granting a provisional accommodation in violation of the law, Defendant pressured her to capitulate and get the COVID-19 vaccine with false

information that Defendant could not continue accommodating her beliefs. Defendant then placed her in a temporary accommodation—a further coercive technique—only to terminate her at the end of the set period of time.

97. Defendant imposed the period of temporary accommodation with the intent to punish those who sought religious accommodation; hoping that the constant reminder of termination would result in them abandoning their religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

98. Defendant's Policy forced those who were denied religious accommodations or placed in temporary accommodations with the caveat of impending termination, into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

99. But for her request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from the period of temporary accommodation where she was constantly pressured to violate her religious beliefs.

100.    Defendant also terminated Plaintiff for seeking a religious accommodation to its compulsory vaccination Policy. Plaintiff maintained her request for accommodation through the date of her termination. Defendant terminated Plaintiff in close temporal proximity to her requesting religious accommodation and/or seeking continued accommodations.

101.    Separately, Defendant refused to admit its mistake and bring Plaintiff

back even after it became apparent that (1) accommodations were available;

(2) the COVID-19 vaccines were not preventing contraction of the virus; and

(3) individuals with natural immunity possessed superior immunity to those

with the vaccine only. Such actions were due to Plaintiff's opposition to

Defendant' illegal employment practice. The company had made up its mind

to purge as many unvaccinated religious employees as it believed it could and

the position against those seeking accommodations had become entrenched.

102.    Defendant's actions in forcing those denied accommodation as sought

into temporary accommodation just to terminate them after an arbitrarily

specified period constitutes retaliation in violation of Title VII.

**SEVENTH CLAIM FOR RELIEF**
**THE PREGNANCY DISCRIMINATION ACT OF 1978 (PDA),**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

103.    Plaintiff incorporates herein the previous averments as if fully set forth.

104.    Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits

discrimination against an employee because of pregnancy which is a form of

sex discrimination.

105.    Plaintiff was a pregnant mother, was qualified for her position as noted

in her performance appraisal, she suffered an adverse employment decision

when the employer chose to create a hostile working condition and force her

from her job when she sought a vaccine exemption to protect her high-risk pregnancy and her unborn child.

106.    Defendant discriminated against Plaintiff because of her pregnancy and sex by, *inter alia*, forcing Plaintiff from her job because she was pregnant and because she sought to protect herself and her unborn baby from a forced vaccine that would prove harmful to her baby.

107.    The discrimination was severe and/or pervasive since it involved the effort to force and intimidate the mother of an unborn child to take a vaccine that caused her anxiety for herself and her baby given, she was a high-risk pregnancy.

108.    The Defendant had knowledge of the actions because they were committed by supervisors and human resources who tacitly approved of the effort by all agents to undermine her job and force her from her position.

109.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered special damages in the form of lost earnings, benefits, and/or out-of-pocket expenses in an amount according to proof at the time of trial.

110.    As a further direct and proximate result of Defendants' conduct, Plaintiff will suffer additional special damages in the form of lost future earnings, benefits, and/or other prospective damages in an amount according to proof at trial.

111.    As a further direct and proximate result of Defendants' conduct, Plaintiff has suffered mental and emotional pain, distress, and discomfort, all to her detriment and damage in amounts not fully ascertained but within the jurisdiction of this court and subject to proof at the time of trial.

112.    Furthermore, Defendant, by and through its employees, conspired to deny Plaintiff her employment rights, as guaranteed by the PDA and Title VII, by creating a hostile work environment, treating her disparately and discriminating against her in her employment on the basis of her pregnancy.

113.    The Plaintiff was subjected to said employment conditions based solely on her pregnancy and was subjected to said conditions when those in non-protected categories were treated differently and favorably in their employment.

114.    In engaging in the conduct alleged herein, Defendant acted oppressively, maliciously, fraudulently, and/or outrageously toward Plaintiff, with conscious disregard for her known rights and with the intention to cause, and/or willfully disregarding the probability of causing, unjust and cruel hardship to Plaintiff and her baby.

115.    In so acting, Defendant intended to and did vex, injure, and annoy Plaintiff.

116.    Therefore, an assessment of punitive damages should be made against Defendant in an amount sufficient to punish them and to prevent them from willfully engaging in future unlawful conduct.

117.    Finally, Plaintiff is entitled to costs and reasonable attorneys' fees pursuant to 42 16 U.S.C. § 2000e-5(k)

## **PRAYER FOR RELIEF**

118.    Plaintiff incorporates herein the previous averments as if fully set forth.

**WHEREFORE**, Plaintiff prays that this Court:

(a)    Declare Defendant violated Title VII, the ADA, and the PDA by failing to engage in the interactive process in response to Plaintiff's request for accommodations to its Policy and, instead, preemptively denying her request based on pretextual reasons.

(b)    Declare Defendant violated Title VII, the ADA, and the PDA for its failure to provide a reasonable accommodation and disparately treated Plaintiff due to her clearly articulated religious beliefs, disability, and her pregnancy when numerous no-cost or de minimis options were available.

(c)    Declare that Defendant violated Title VII, the ADA, and the PDA by retaliating against Plaintiff for engaging in protected activity through seeking religious, disability and pregnancy accommodation.

(d)     Award Plaintiff damages, including back pay, front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages and other affirmative relief necessary to eradicate the effects of Defendant' unlawful employment practices.

(e)     Award Plaintiff damages necessary to make her whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an amount to be determined at trial.

(f)     Award reasonable attorney fees and costs; and

(g)     Award such other and further relief that this Court may deem just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby respectfully demands trial by jury on all counts so triable.

DATED this the 27th day of April 2023.

_By: /s/ Jeremy A. Donham, Esquire_
Jeremy Donham, (206980)
**DONHAM LAW**
714 Venture Drive, Ste. 144
Morgantown, West Virginia 26508
717.881.7855 (phone)
J.Donham@Donhamlaw.com

Charles J. Hobbs (209321)
**THE HOBBS LAW FIRM**
256 E. Market Street
York, PA 17403
(717) 793-2398 (Phone)
Email: chobbs@thehobbslawfirm.com